IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **SHAWN E. LAPPIN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Civil No.** 15-cv-353-CJP[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Shawn Lappin is before the Court, represented by counsel, seeking judicial review of the final agency decision denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits on May 14, 2012, alleging disability beginning on January 11, 2012. (Tr. 20). After holding an evidentiary hearing, ALJ Lee Lewin denied the application in a written decision dated December 23, 2013. (Tr. 20-30). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 15.

Plaintiff raises the following points:

1. The ALJ improperly assessed plaintiff's RFC.

2. The ALJ erred in analyzing the opinion from the examining physician.

3. The ALJ improperly assessed plaintiff's credibility.

4. The ALJ erred in failing to question the vocational expert about the source of components of her testimony.

## **Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  As is relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520;** *Simila v. Astrue*, **573 F.3d 503, 512-513 (7th Cir. 2009);** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment,

determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).** See also, ***Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled.... If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See**, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)**).

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).** In reviewing for "substantial evidence," the entire administrative record is taken into

4

consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ Lewin followed the five-step analytical framework described above. She determined plaintiff had not been engaged in substantial gainful activity since his alleged onset date. (Tr. 22). She found plaintiff had severe impairments of bilateral hip necrosis, bilateral hip osteoarthritis, status post left hip arthroscopy, bilateral shoulder vascular necrosis, and mild obesity. (Tr. 23). The ALJ determined these impairments do not meet or equal a listed impairment.

The ALJ found plaintiff had the residual functional capacity to perform work at the sedentary level, with physical limitations. (Tr. 23). Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to perform his past work. However, he was not disabled because he was able to perform other work that exists in significant numbers in the regional and national economies. (Tr. 28-29).

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1. Agency Forms**

Plaintiff was born on September 6, 1974 and was thirty-seven years old on his alleged onset date. He was insured for DIB through March 31, 2017.[3] (Tr. 38, 197). He was five feet eight inches tall and weighed two hundred and five pounds. (Tr. 201). He completed high school in 1993 and was enrolled in some special education classes. (Tr. 201-02). Plaintiff received an Examiner's license in 2006. He previously worked as a roof bolter, mine examiner, and decorator. (Tr. 202).  Plaintiff felt his ability to work was limited because his left hip collapsed and he had vascular necrosis in his right hip. (Tr. 201).

Plaintiff completed function reports in June and November 2012. (Tr. 208-18, 254-65). Plaintiff lived in a home with family. He stated that his problems standing, walking, sitting, and lifting limited his ability to work. (Tr. 208, 254). He had a dog he cared for and he prepared his own simple meals. (Tr. 209-10). He also had two daughters he cared for every other week. (Tr. 255). He could do laundry for about five minutes. He stated that some days his pain was so bad that he did not leave his bed and he needed encouragement to perform any tasks. (Tr. 210, 256). He was able to drive, ride in a car or walk. (Tr. 257). He had no difficulty paying attention or following instructions but he did not think he handled stress well. (Tr. 213-14, 259-60).

---

[3] The date last insured is relevant to the claim for DIB, but not the claim for SSI.  See, 42 U.S.C. §§ 423(c) & 1382(a).

Plaintiff claimed his injuries affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks. He felt he could walk fifty feet before needing to rest for five or ten minutes. (Tr. 213, 259). Plaintiff used crutches or a cane when he had to walk long distances. (Tr. 214, 260). He claimed to have pain in his right hip when he reached overhead or above waist level. (Tr. 217, 263). He stated he had sharp pain in his hip any time he got in or out of a car, got up from a chair or sofa, or got out of bed. He felt the longest he could sit due to his pain was fifteen to thirty minutes. (Tr. 218, 262).

### 2. Evidentiary Hearing

Plaintiff was represented by counsel at the evidentiary hearing on September 12, 2013. (Tr. 35-79). Plaintiff was thirty-nine years old, five feet eight inches tall, and two hundred and ten pounds at the time of the hearing. (Tr. 42). Plaintiff lived with his father and had a driver's license. (Tr. 53-54). He indicated he did not drive often because he recently sold his vehicle to pay for a hip replacement surgery. Prior to selling his car, plaintiff testified that he only drove two or three times a week to purchase groceries. (Tr. 54). He did not travel in a car for more than forty-five minutes because he had difficulty sitting in a vehicle for long periods of time. (Tr. 57). His sister came and helped clean and do household chores. Plaintiff stated he could do some of his own laundry but did little else around the house because it hurt to stand. (Tr. 55).

Plaintiff worked in a coal mine for nine years before stopping work in January 2012. (Tr. 42). He drove a ram car and was operating the car when he became injured. He testified that he was getting out of the cab of the machine

and his jacket got caught on a lever. This caused him to fall and hurt his ankle and hip. He never returned to work after this incident. (Tr. 43).

The ALJ noted that the record seemed to show plaintiff had a hand injury on the job and earnings in the spring of 2012. Plaintiff indicated he did not work after his alleged onset date and was unsure why the records indicated he had earnings. (Tr. 45-46). Plaintiff testified that his hip injury is what caused him to be unable to work. His orthopedic doctor, Dr. Chien, diagnosed him with avascular necrosis of the hip. (Tr. 46). Dr. Chien recommended a complete left hip replacement and decompression. Plaintiff stated that he did not have the replacement right away because he did not have health insurance. (Tr. 47).

Plaintiff testified that pain was the main thing keeping him from being able to work. (Tr. 47). He stated that on average his pain is a seven or an eight out of ten. Soaking in a tub, ice packs, and heating pads helped with pain relief. He indicated he could sit or stand for about ten or fifteen minutes at a time. (Tr. 48, 61). He felt he could stand for a total of two or three hours in an eight hour day and sit for about an hour. (Tr. 60-61). He took Excedrin or Tylenol for pain. His doctor originally gave him a prescription for Tramadol but he stated that he could not afford to get it refilled. (Tr. 49). He also had injections into his hip but he did not feel they were helpful. Plaintiff testified that he still owed money for the injections. (Tr. 50).

Plaintiff had hip replacement surgery three weeks before his evidentiary hearing. (Tr. 39, 51). Prior to his surgery, plaintiff stated he could walk forty to fifty feet, typically with a crutch. After the surgery, plaintiff walked with either a

cane or a walker. (Tr. 51). He stated that he had pain in his other hip and his back since he had his hip replaced. (Tr. 52). He testified that he only slept two or three hours at time due to pain. (Tr. 56).

Plaintiff also had trouble with his shoulders and arms. He could only hold about seven pounds with his left arm and hand and his right arm "locked up" on him. His difficulties with his shoulders and arms began in 2010 after a fall. (Tr. 57). He could lift his left arm in all directions and was able to feed himself. He testified that his doctor indicated he had a "considerable amount of collapsing in the left shoulder." (Tr. 58). He had problems grasping with both his left and right hand but the left was worse. He indicated this was a result of avascular necrosis in his shoulders as well. (Tr. 63). He was not receiving treatment for his shoulders or arms because he could not afford it. (Tr. 59). Plaintiff also stated he had problems with his knee that caused pain three or four times a week. (Tr. 62). Plaintiff testified that he smoked about a pack of cigarettes a week and drank about a case of beer a week as well. He stated that he drank when his family came over and they all split the beer but he did not pay for it. (Tr. 64).

A Vocational Expert (VE) also testified. (Tr. 65-78). The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history that was able to perform sedentary work but could only occasionally stoop, kneel, crouch, crawl, balance, and climb ramps and stairs. (Tr. 74-75). The person could never climb ladders, ropes, or scaffolds. (Tr. 75). The person could occasionally operate

bilateral foot controls, reach overhead bilaterally, and manipulate with the non-dominant left upper extremity. Additionally, the person should avoid concentrated exposure to hazards including dangerous moving machinery and unprotected heights. (Tr. 75).

The VE testified that the person could not perform any of plaintiff's previous work. The person could still perform jobs that exist in significant numbers in the national economy. Examples of such jobs are circuit board assembler, document preparer, and surveillance monitor. (Tr. 73-76). However, several of the jobs would have a reduced amount of availability as a result of the restrictions. The availability of the circuit board assembler and document preparer jobs would be reduced by fifty percent. (Tr. 76). The VE also stated that if the individual had to miss more than four days of work all jobs would be eliminated. Additionally, if the person could not sit, stand, or walk eight hours in an eight hour workday all competitive employment would be precluded. (Tr. 77).

### 3. Medical Evidence

In January 2012, plaintiff reported to Sparta Community Hospital with pain in his back and left hip after falling at work. He had tenderness and a limited range of motion in his left hip. (Tr. 280). Later that month, plaintiff had an MRI and an X-ray on his left hip. (Tr. 283, 289). The MRI revealed prominent bilateral avascular necrosis of the femoral heads[4], but no significant

---

[4] "Avascular necrosis is the death of bone tissue due to a lack of blood supply." The condition "can lead to tiny breaks in the bone and the bone's eventual collapse."
http://www.mayoclinic.org/diseases-conditions/avascular-necrosis/basics/definition/con-20025517

collapse or flattening deformity. It also displayed mild bone marrow edema in the left acetabulum[5] with a prominent lobulated subchondral cyst[6]. (Tr. 283). The X-ray results indicated plaintiff had accelerated arthritis to the left side that suggested the possibility of avascular necrosis. (Tr. 289).

Plaintiff also saw orthopedist Dr. Tony Chien in January 2012. He diagnosed plaintiff with avascular necrosis in both hips and degenerative joint disease of the left hip. Dr. Chien recommended plaintiff have total hip arthroplasty due to the collapsing of the avascular necrosis. (Tr. 394-96). In June 2012, plaintiff presented at Franklin hospital with hip, shoulder, and neck pain. He was given Norflex and Meloxicam for pain. (Tr. 385). In June 2012, plaintiff saw Dr. Chien again. Plaintiff had difficulty with ambulation and activities of daily living. He noted plaintiff's symptoms were getting progressively worse. (Tr. 391). Dr. Chien stated plaintiff was unable to work at that time. (Tr. 392). Plaintiff followed up with Dr. Chien again in September 2012. Dr. Chien noted plaintiff had bilateral hip pain and would need a hip replacement. He prescribed tramadol and stated plaintiff could work at a desk sitting job only. (Tr. 390).

In February 2013 plaintiff presented at Marshall Browning Hospital with bilateral hip pain and it was again recommended he pursue a total hip replacement. (Tr. 403). It was noted that on examination, plaintiff had

---

[5] An acetabulum is the socket of the hipbone. http://www.merriam-webster.com/dictionary/acetabulum
[6] A subchondral cyst is "a fluid-filled sac that forms inside of and extends from the bone of a joint." https://www.verywell.com/what-is-a-subchondral-cyst-2552235

avascular necrosis in both hips with the left side more prominent than the right. (Tr. 408).

In August 2013, plaintiff presented at the Orthopedic Institute of Southern Illinois reporting constant sharp and achy pain in his hips. He stated his pain was an eight out of ten and nothing helped relieve pain. His pain predominantly occurred while walking. He had injections in his hip but they were not helpful. (Tr. 451). The doctor noted plaintiff's X-rays and MRIs indicated he had avascular necrosis of his hips bilaterally with early collapse of the left femoral head. (Tr. 451, 453). Later that month, plaintiff had a total left hip replacement. (Tr. 467-76).

In September 2013, he returned to the Orthopedic Institute for a postoperative follow up and stated he had quite a bit of pain when he went from sitting to standing. He was in therapy but had stopped because he was doing "okay." On physical examination the doctor noted plaintiff's left leg seemed longer and plaintiff had a lot of pain with abduction. The doctor indicated he wanted plaintiff to return to therapy and return for a follow up soon. (Tr. 497). In December 2013, prior to the ALJ's decision plaintiff returned to the Orthopedic Institute for a follow up on his hip. The physician's assistant indicated plaintiff's implant looked excellent but plaintiff had a leg length discrepancy. (Tr. 499).

Plaintiff also has records indicating he had problems with his shoulders. In June 2011 plaintiff had an MRI after he presented with left shoulder pain and a decreased range of motion after a fall. The MRI indicated he had a

healing fracture deformity throughout his left shoulder, mild joint effusion, and mild tendinopathy without evidence of a rotator cuff tear. (Tr. 318).

Plaintiff also had an X-ray that indicated he had sclerotic changes and possibly early signs of avascular necrosis in his shoulders. Plaintiff received cortisone injections but declined therapy because he was paying out of pocket. (Tr. 325). Plaintiff also complained of shoulder pain in August 2013 when he presented at the Orthopedic Institute. He had a restricted range of motion and tenderness but no evidence of instability or atrophy. (Tr. 444). He had radiographs done of both shoulders which indicated avascular necrosis and evidence of early collapse. (Tr. 444, 446). His doctor stated that he should have physical therapy on his shoulders to see if he could benefit from conservative treatment first. (Tr. 445).

### 4. Medical Examination

In May 2012, plaintiff saw Dr. Matthew Collard for an independent medical evaluation. (Tr. 296-99). Dr. Collard reviewed plaintiff's medical records prior to that date and described them in detail. (Tr. 296-67). Plaintiff favored his left leg while walking and his left hip showed "exquisite pain" over the groin with internal and external rotation of his hip. (Tr. 298). Dr. Collard's impressions were idiopathic avascular necrosis of the bilateral hips and severe left hip pain. (Tr. 298). Dr. Collard indicated he believed plaintiff's hip pain was a result of avascular necrosis and not the result of any one particular incident. He also stated that he did not believe plaintiff could return to full work duty, but instead needed a non-ambulating sedentary type job. He felt plaintiff would

need a total hip replacement on his left hip, and eventually a total replacement of the right hip as well. (Tr. 298-99).

### 5. RFC Assessments

Plaintiff's physical RFC was assessed by state agency physician Richard Bilinsky in July 2012. (Tr. 80-95). He reviewed plaintiff's records but did not examine plaintiff in person. Dr. Bilinsky opined that plaintiff could occasionally lift or carry twenty pounds and frequently lift or carry ten pounds. He felt plaintiff could stand or walk for two hours out of an eight hour day and sit for six hours. Plaintiff's ability to push and pull with both lower extremities was limited. (Tr. 92). Plaintiff could occasionally climb ladders and stairs, balance, stoop, kneel, crouch, and crawl. He could never climb ladders, ropes, or scaffolds. (Tr. 92).

Dr. Bilinsky opined that plaintiff should avoid concentrated exposure to hazards like machinery and heights but he had no further environmental or manipulative limitations. (Tr. 93). He felt plaintiff's maximum sustained work capability would be sedentary work. (Tr. 94). In December 2012, state agency physician Lenore Gonzalez also reviewed the record and agreed with all of Dr. Bilinksy's findings. (Tr. 98-115).

## Analysis

Plaintiff argues that the ALJ erred in forming plaintiff's RFC, in analyzing the opinion of an examining physician, in forming her credibility assessment, and in failing to question the VE about the source of components of her

testimony. As plaintiff relies in part on his testimony, the Court will first consider his argument regarding the ALJ's credibility analysis.

It is well-established that the credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. ***Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).** "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." ***Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).**

Plaintiff takes issue with the ALJ's usage of boilerplate language that has been criticized in cases such as ***Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010)**, and ***Brindisi v. Barnhart*, 315 F.3d 783 (7th Cir. 2003).** However, the use of the boilerplate language does not necessarily require remand. The use of such language is harmless where the ALJ goes on to support her conclusion with reasons derived from the evidence. **See, *Pepper v, Colvin*, 712 F.3d 351, 367-368 (7th Cir. 2013); *Shideler v. Astrue*, 688 F.3d 306, 310-311 (7th Cir 2012).**

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.

Plaintiff also contends the ALJ erred in not looking to his work history to support his credibility claims. As the Commissioner notes, the Seventh Circuit has stated that a claimant's work history is just one factor among many, and it is not dispositive. ***Loveless v. Colvin***, **810 F.3d 502, 508 (7th Cir. 2016)**. The ALJ's failure to consider plaintiff's lengthy consistent work history is not error when other factors are appropriately considered. However, while the ALJ considered a variety of other credibility factors, her analysis is legally insufficient.

Plaintiff argues that the ALJ erred by failing to identify which of plaintiff's statements she found to not be entirely credible. He then goes on to list several portions of testimony where he claimed to have difficulty performing tasks, pain in his hip and back, and needed to lie down. Contrary to plaintiff's suggestion, "an ALJ's credibility findings need not specify which statements were not credible." ***Shideler v. Astrue***, **688 F.3d 306, 312 (7th Cir. 2012).**

While the ALJ need not address every portion of plaintiff's testimony or specify which statements are credible her analysis concerning the objective medical evidence in relation to plaintiff's credibility is inadequate. Her credibility analysis with regard to the objective medical record is limited to plaintiff's claims that he had knee pain and shoulder pain. She noted there is little evidence his problems worsened and they were longstanding. She stated that plaintiff testified he had sharp knee pain for two or three minutes several times a week but this is not reflected in the record. (Tr. 25).

The Seventh Circuit has held that in order to properly assess whether someone has the symptoms they allege an ALJ needs to look at the reasoning as to why treatment was avoided. ***McKinzey v. Astrue*, 641 F.3d 884 (7th Cir. 2011).** The Social Security Administration and the Seventh Circuit have stated that an inability to afford treatment is a legitimate reason for not seeking it. SSR 96-7p; ***Shauger v. Astrue*, 675 F.3d 690 (7th Cir. 2012).** The ALJ here acknowledges that plaintiff did not have health insurance and that he stated multiple times that he could not afford treatment, but she still uses his lack of treatment against him. This is error.

Further, the ALJ's placed a significant amount of weight on the fact that plaintiff made one statement regarding his knee hurting for a few minutes a few times a week but had not told his doctors on record. She noted that he had a knee surgery in the past, but failed to discuss this issue further with his doctors after his alleged onset date. She does not discuss how almost all of plaintiff's claims of pain in his shoulders and hips were supported by the record. (*Ex.*, Tr. 318, 391, 394, 444, 446). Nor does she discuss how plaintiff's statements that his legs were a different length post hip replacement were supported by the medical notes on record. (Tr. 497, 499). The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." ***Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014)**.

This Court notes that an ALJ's credibility analysis is not confined to one paragraph and may be woven throughout her opinion. ***Sawyer v. Colvin*, 512 F. App'x 603, 608 (7th Cir. 2013)**. Here, however, when the entire opinion is analyzed it appears as though the ALJ selectively disregarded portions of the record in forming her credibility determination. ***Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).** Elsewhere in the opinion she discusses plaintiff's issues with his shoulders and hips, but she fails to mention how the vast majority of his testimony regarding his medical issues was supported within the record, and instead focuses on the one portion that was not.

Plaintiff contends that the ALJ incorrectly considered plaintiff's daily activities in forming her credibility determination. The Seventh Circuit has repeatedly held it is appropriate to consider daily activities but it should be done with caution. ***Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013).** The ALJ stated plaintiff's claim that he spent his day going from the couch to the recliner or bed was not supported by his reports that he made simple meals, did laundry, and shopped for food. Additionally, she felt his report that he only used a crutch when he walked long distances indicated he was not as disabled as he stated. (Tr. 25-26).

The ALJ failed to consider that plaintiff could choose to perform these minimal daily activities when he was not experiencing symptoms. It is unclear how plaintiff's ability to feed himself, occasionally do laundry (the ALJ acknowledged elsewhere in the opinion that plaintiff's sister typically did most of the laundry), shop for groceries, and use a crutch when walking long

distances is not supported by his testimony that he typically spends all day moving from the couch to the recliner or bed. The Court does not follow the ALJ's determination that plaintiff's minimal daily activities are not in line with his claims of limitation.

Finally, plaintiff argues that it was inappropriate for the ALJ to use plaintiff's tobacco and alcohol usage against him in her credibility assessment. The ALJ stated that "[a]lthough the claimant has alleged lack of money as the explanation for infrequent treatment reflected in the record, there is some indication that the claimant spent money for other purposes such as tobacco and alcohol." (Tr. 26). The ALJ then cited a record that stated he had chronic tobacco use. (Tr. 392). The Commissioner argues that there is an inconsistency between plaintiff's claim of lack of money and his ability to afford his cigarette habit.

First, as plaintiff notes, there is no indication plaintiff was purchasing his own cigarettes or alcohol. In fact, as the ALJ noted elsewhere in her opinion, plaintiff testified that his family members always purchased the alcohol. (Tr. 25, 64). Even if plaintiff did purchase his own alcohol and tobacco, there is no indication anywhere within the record that the cost of cigarettes and beer were equal to that of medical treatment. As plaintiff states, the Seventh Circuit has stated that an ALJ cannot assume a claimant is spending money on tobacco products instead of pursuing medical treatment without establishing the cost of both. ***Eskew v. Astrue*, F. App'x 613, 616 (7th Cir.**

**2011)**. The ALJ's presumption that plaintiff was spending money on alcohol and tobacco instead of seeking medical treatment is error.

An ALJ must build logical bridge from evidence to conclusion. To permit meaningful review, the ALJ must explain sufficiently what she meant. "If a decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," a remand is required. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir.2002)." ***Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir., 2012).** Here, the ALJ failed to adequately assess plaintiff's credibility and her opinion must be remanded.

It is not necessary to address plaintiff's other points at this time. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

Plaintiff's motion for summary judgment is granted. The Commissioner's final decision denying Shawn E. Lappin's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE: September 7, 2016.**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**